Counsel, you may proceed. Thank you. Good morning, Your Honors, and may it please the Court. Mary Christine Zingaila of Snell & Wellmer appointed pro bono counsel for Mr. Zuniga-Hurtado. And I would like to reserve three minutes for rebuttal. You may do so, counsel. Just watch the clock as it counts down. And fend us off. Thank you. All right. May I ask, are you affiliated with Snell & Wellmer? Yes, I am. You are. But in the Costa Mesa office? Yes, in the Costa Mesa office, correct, yes. And I know, Judge, my good colleague would congratulate you for doing this pro bono, because he's a good man and he always does it. But since we've got the pro bono and we've taken a little time to do it, I thought we ought to especially congratulate you for doing that kind of service to the Court. Well, thank you very much. I think that's great. Please proceed, counsel. Thank you. The district court erred in determining that Mr. Zuniga failed to produce sufficient evidence to support his claim of citizenship. As a result, the immigration court lacked jurisdiction to order Mr. Zuniga's removal from this country. While Mr. Zuniga's birth outside the United States may have raised a presumption of alienage which he was required to rebut, his burden, we urge, was not one of preponderance of the evidence, but a lower one requiring the production of only substantial, credible evidence less than a preponderance and more than a scintilla to rebut the presumption and then shift the burden back to the government to prove by clear and convincing evidence that he was not a citizen and deportable. All right. But you have this burden of establishing 5 years past age 14. And I must say, so far, and I've looked at this record very closely, the most I can find is 3 months, and 3 months. I don't find 5 years. Okay. Well, it does require some piecing together. Before we quite get there, what's my standard of review to the district court's decision? Well, the standard of review Now, I'm talking about what the district court was required to do. I understand. But what do I do? Because that was significant to me. Then you can get to the evidence. Okay. This Court's review is DeNovo. So I can DeNovo review the substantial evidence finding? Mm-hmm. Even on citizenship that I refer to the district court to do? What case says that? Well, there's a long line of U.S. Supreme Court cases. Then send me the best you got. We review the we review the eventual finding, DeNovo, but don't we review his factual findings with deference? That's what I was going to say. Clearer, right? But there are Right. The government argues clearer, right. But we urge DeNovo review. Where is here the right of citizenship is at stake, and there's a potential for deportation. This Court reviews that DeNovo. That's why we sent it to the district court, because we don't take evidence. Well, right. We allow the district court to take the evidence and put it down and make some determinations. And at that point, I understand on those factual determinations, we have clear error review, but a DeNovo over all of the particular issue. Would you agree? No, I don't, based on a long line of U.S. Supreme Court cases that this Court is considering en banc. Your best one, then. Send that up, because I don't know that I agree. But let me understand here. So let's assume that what happened was there were two witnesses in this hearing. One of them said Petitioner, because I'll get his name wrong. Petitioner's mother was – I saw her every day for 5 years, and she was in the United States in Mesa. And another witness said, no, no, I accompanied her to Mexico during 6 months of those 5 years. And Judge Snowe said, I've heard both of them and I believe the second one, not the first one. What would – what would our standard of review be? Would we make a credibility determination as to the – as to the second one, or would we defer to his credibility determinations? Well, in the context of a removal proceeding – But this – in the context of this precise proceeding, where we have – Right. Where we have, in effect, asked him, because that's what the statute tells us to do in a removal proceeding, to make – to make factual determinations relating to citizenship. Correct. But – but still, in – in that situation where citizenship is at issue, we argue that the standard should be the same review as that is in denaturalization proceedings, in Baumgartner, and the cases that this Court is considering and it's on Bankman v. Vega. We faced this a little bit back in an embank and we – we ended up not deciding the case. Who knows whether we ever will. But isn't denaturalization different? In other words, if we're taking away citizenship, then we want to really put the government through its – through its burden. We want to make them dot all the i's and cross all the t's. But if the question is simply one of where you were born or how long your mother was here, isn't that simply a question of fact? We – we start out with a presumption of noncitizenship here. You agree to that because your client was born in Mexico. So once that occurs, we have a factual hearing in front of the district judge. Why don't we review his findings the same way we would review them in any other circumstance? Because here we have – we have a claim for – I agree. It's not the exact situation. It's not a denaturalization. It's not a situation where the government has already agreed that he's a citizen. It's not that case either. But – but the U.S. Supreme Court cases like Baumgartner and Naur and Fedorenko and Schant, all of those, and even this Court as well, in Limvese v. Mitchell, has stated that where the reasoning for this de novo review is because such a precious right is at stake. In this case, he is arguing he has derivative citizenship, but if he – Robertson, let's assume – let's assume you're right. Let's assume I'm applying de novo review to the evidence before Judge Snowe, which the government seems to me to have the stronger case. You've got a couple – a couple declarations, one of which is impeached in a deposition, and they've got lots of other stuff. So, I mean, if I'm – if I'm the finder of fact, which I don't want to be, I didn't sign up for that job, tell me why – but under your view, I am. Tell me why I win, why you win. Now, we're back to Judge O'Scallon's question. Did you really make your burden? We've moved back to this. Whether it's preponderance or substantial evidence standard, we contend that we did make the burden. We did meet that burden, that his mother was President in the United States for 5 years, sometime over a 25-year period, between 1936 and 1961. So tell me what the – viewed in the light most favorable to you. Yes. What's the evidence? Okay. So there are – Mr. Zuniga's case in chief, there were three siblings who testified. There's the testimony of his sister Maria, that their mother's visits to the U.S. from her youth until the time of Mr. Zuniga's birth, total at least 5 or 6 years. And then there is testimony from his other sister and brother that's consistent with this, confirming first that the father came to work in the United States for most of every year between 1954 and 1962 in the Bracero Program, and even before then. What did Judge Snow do with those witnesses in that testimony? What Judge Snow did, which we also contend is improper, was then turn to the evidence that the government presented in its case in chief. Isn't that allowed? Well, arguably no, because what he was deciding at this point in time was whether we had met our burden of production, and therefore it was not time for him to start looking at the government's evidence, because he never shifted the burden back to them for clear and convincing evidence. But you're arguing that we're – that we should exercise the novel review. So we have a – we have a case – this is what I was asking. We have a case here with all the evidence, the government's evidence and your evidence. Yes. And you're arguing that Judge Snow put the cart before the horse, and maybe he did. But now that we have both the cart and the horse here, tell us why you win rather than the government. So he – Judge Snow points out some flaws in the – in your case in chief. And they seem to me to be well taken. Well, first he points out, in a way that he misunderstood the evidence, the testimony of the sister Rosario, that, oh, she admitted on cross-examination her mother wasn't here for five years. But if you look at the context of that statement, what she really said was, I gave a specific amount, I said five to six months, the last time she visited. I didn't say years, I said five to six months. That is clearly what she was referring to in the cross. So he relies on something she never said, that she refuted this – this total presence of five years. And I may have the two sisters confused, but wasn't one of them not born yet at the same time in the United States? Murray. I believe, well, for part of it, I mean, they were 11 or 12 years older than Ms. Zuniga. She wouldn't have known of her own personal knowledge about the time period before she was born. Well, except through stories of the family, the mother and father indicating the presence. And also the aunt saying that she came to visit. The kind of stuff that Judge Snow pointed to. So, and then – And then the other aspect that the Court pointed to were the statements and naturalization applications by two of the brothers, Ruben and Jorge. And he treated those statements as countering the evidence that Petitioner presented about presence. There were statements about that she didn't – she lived in Mexico and she hadn't lived here for this continuous period of time, and also that she didn't reside here. But those statements are not necessarily inconsistent with the testimony of the siblings in this hearing, because for that purpose, asking someone whether your mother lived here all the time, that would be a different question than saying she visited several times during that year. So – That isn't exactly what the naturalization document says, is it? The naturalization document says she did not return to the United States from 1932 until 1962. Right. There is a comment about she didn't return here. But given – She did not return from 1932 until 1962. Correct. There is that statement, but the – She went to Mexico when he was eight, and his father was a seasonal – this is Ruben His father was a seasonal worker since Ruben was four, and then there was a naturalization document which came forth that said his mother did not return to the United States from 1932 until 1962. In other words, in Mexico throughout that time. But if that is – the question is how is that – but the question is how is that answer interpreted? We don't know. The agent, Mr. Harrell, who testified said he didn't really have any personal knowledge about what exactly was asked and what happened. And if you look at the face of that statement, not returning at all is completely contrary to the – every story and every statement that the family has ever made that she did visit. So again, we're stuck with deciding credibility on a record? The no vote? Well, where the naturalization paper shows speculation – That's really what you're asking me to do. That's why – Well, except I – That's why I wanted you to talk about it. I mean, I look at Rosario Zuniga Serda. I look at the things she says. And I look through. Born in 49. Mother was born in California. Father worked in the U.S. Mother went several times to see him. The last time she stayed five or six months. Mother was never away five years, only five months. But that's not what she said. That's an interpretation that is incorrect based on the cross-examination. That last statement is not what she said. It's not what she testified. Are you contending it's an incorrect translation or an incorrect – No, it's an incorrect interpretation of her answers on cross-examination. So is it your point that there was nothing really contested in front of the district judge, that all this evidence comes in and we're just supposed to figure out what it means? Well, certainly all of the evidence of the siblings' testimony came in, for sure. I know you wanted to save a couple minutes. Counsel, you're down to two minutes. Yeah. Okay. You may reserve. Okay. Thank you so much. We'll hear from the government. Counsel, you may proceed. Thank you. Your Honors, may it please the Court. My name is Samuel Goh, and I represent the government in this matter. Your Honors, Petitioner is the second youngest of ten children. All ten children, including Petitioner, became lawful permanent residents, and six of his siblings naturalized to become U.S. citizens. That avenue of citizenship would have been available to him also, but for a number of criminal convictions he incurred, including an aggravated felony conviction for disorderly conduct of domestic violence, felony convictions for vehicular manslaughter and criminal trespass, and a misdemeanor conviction for assault. Thus, facing removal without any other immigration relief available, Petitioner is making a claim that none of his other siblings have attempted the claim, that he acquired U.S. citizenship derivative from his U.S. citizen mother. Does that matter? I mean, I know you make that argument in your brief that his siblings wouldn't have been eligible, would have been citizens, and therefore wouldn't have had to apply for citizenship. But maybe they didn't know. Maybe they didn't consult with someone who said there's this alternative. I'm not sure why that's probative of anything. Tell me why it should make any difference to me that the siblings were naturalized. Yes, Your Honor. As we had talked about in discussion with Mr. Harrell's testimony, first of all, the naturalized siblings applied for, you know, the claim derivative of citizenship. I understand, but what difference does it make to me what the state of mind of the siblings was? Because you don't have any evidence that the siblings went through this process where they said, oh, we can't apply the route that this guy is going because mom was never here for five years in a row. So we must take an alternative route. They took an alternative route and it was successful, but I'm not sure it tells me anything about the facts of this case. It's interesting, but what did it tell me? Well, Your Honor, I agree that we don't have any evidence of their state of mind when applying for the naturalization. Or even that one of them had said at the time, well, my mom went back and forth and never remained here for five years, and so this is why I'm taking this route. It's a nice fact, but it doesn't do much for me. I agree with my colleague. I mean, it's like the plaintiff's lawyers used to do when I was on the district court. They wanted to get in every accident that ever happened with any particular, if you will, good that somebody had used, as if that was going to make a difference for the accident for that particular good in this particular situation, which in a negligence case I threw out every time. So I think you've got better arguments than that. What is a better argument? Yes. I will get to the better argument. I just would like to say that, though, it was addressed in the interview where they all claimed that their mother was born in the United States, and then you also have one of the siblings, Ruben, saying that his mother did not leave Mexico. Right. That's a separate issue, whether you can get that evidence in. I'm just saying the fact that these folks were naturalized doesn't do much for me. Sure. So let's assume that, as your colleague suggests, they put in enough evidence to shift the burden back to you. I'm not sure they did, but let's assume that that was the case. How did you rebut the burden in this case? Your Honor, our position is that there was no documentary testimony evidence that was credible in the first place. And that's what the district court judge found. And I know that's what Judge Snow found. And I'm asking a different question. She's saying he was wrong. We put in enough to reach whatever burden we have. By the way, I'm not sure there's any difference between substantial credible evidence and preponderance of the evidence, because I think the cases are talking about two different things. But let's assume that whatever burden there is, and our cases say preponderance of the evidence, they put in enough to shift the burden back to you. Did you do anything to rebut it? Your Honor, while I say that the district court did not get there. I hear you. I've heard you twice. I may well think you're right. I'm just asking if you're wrong, did you rebut it? Yes. I think there was evidence in the fact that we have six older siblings that were naturalized, where they could not naturalize if they had. That's one thing. What other evidence did you put in? And then you have the evidence in the records with the naturalization applications about the interviews that were taken, and you have one of the siblings saying, yes, specifically, my mother was not in the United States between 32 and 62. So as to those, can you address the evidentiary issues that your opponent raises? Are you talking about the burden of proof? No, I'm talking about whether or not some of the information on the declarations was admissible. Yes, Your Honor. I believe that. You're talking about the affidavits, for instance. Yes. With regards to the declarations of, I believe, Ms. Glenn and Mr. Arian. Yes. Both Ms. Glenn and Mr. Arian disavowed their – with their statements with their deposition testimony. Both of them actually said they acknowledged the depositions. They're – in their depositions, they signed the English language declarations, but they testified they cannot read or write English. They did not read the English language declaration. They did not dictate it. And I wanted to ask about that, because it seems to me that that may well be a reason for the judge not to find the declarations not credible, which gets back to the point we had before. But given that these people were deposed and confronted with the declarations during their depositions, aren't the declarations at least technically admissible? Somebody said to them in their – in their deposition, is this your declaration? Yeah, that's what I said, but I didn't really mean it. Doesn't it come into evidence? Your Honor, the government would say that it was – they were both disavowed and inadmissible hearsay. But even assuming arguendo, that they were admissible, they do not show, and this is in line with the rest of the testimony, that there is even any substantial credible evidence. I understand that. I guess as a continuing evidence nerd, I have some problem with saying that a statement is inadmissible hearsay when somebody is subjected to cross-examination, says that's my statement, identifies it, and then maybe disavows it. So that may – that may remove its significance, but it's hard to think of a hearsay when somebody in a deposition says, yeah, that's something that I wrote. Isn't it – isn't it just a – hadn't they adopted or syndicated it? Did they really say they write it? I'm sorry, Your Honor? Did they really say they wrote the declarations or that it was theirs? They did not. Or did they say – and this was – I mean, frankly, my colleague is stealing my questions, but I'm happy he is because he's much better at them than I. But my worry was that even after that, what they said was enough to say, well, yeah, it was something I signed, but I don't agree with it. It isn't mine. I – Well, Your Honor, I'm – That certainly makes it not very weighty. Yes. And as a fact, there is one disavowal specifically from Ms. Glenn where she says, you know, the declaration says, oh, I attended the grandmother's – the grandmother's funeral and Petitioner's mother came with me. And in the deposition, she – actually, she testified that, no, she did not go to that funeral, and no, the mother didn't – did not go with her. So how are these – tell – your opponent has a different view of this, I take it. But tell me how you think these proceedings are supposed to proceed. We send it to the district judge and we say, there appears to be a fact question that we need you to resolve for us. Yes. Whose burden goes where and what happens next? Your Honor, I think it should proceed in a way that all other declaratory judgment actions and trial actions should go, which is preponderance of evidence. You have here this judicial mechanism where the appellate courts tell the district court, I want you to find these facts. They then go into a full-blown trial proceeding where they have extensive discovery. Both sides can depose witness – depose witnesses, find evidence, and then all of this comes into play. And this is why Petitioner's standard of substantial credible evidence doesn't work. Well, it's unlike a denaturalization proceeding where the initial burden is on the government. Yes. Somebody's a citizen and you're coming in and saying, we have the burden of showing that you're not. Here, because the Petitioner was born in Mexico, the initial burden is on him to demonstrate citizenship. But I'm trying to figure out how these presumptions work. Okay. You have a presumption and then a – enough to meet the presumption, but meeting the – rebutting the presumption may not beat the other side's burden of proof. It may just – it may just remove the – the presumption and still leave us with a situation where the judge has to find facts. Sure. That's what I'm trying to find out, how these all mesh together. The district court is just tasked with determining citizenship. Is this person a citizen? The Petitioner presents his case, the government presents their case and their evidence. The district court weighs both sides of the evidence and they find who has the preponderance of the evidence. Tell you how I read this presumption, because this is – I've only seen a couple of these cases. Tell me if you think I'm wrong. In effect, if you – if the other side doesn't produce enough evidence to create a question of fact, then the presumption means the judge can grant summary judgment. There's a presumption against citizenship and the Petitioner has to bring in enough credible evidence to show that there's a factual issue. Once the Petitioner does that, then there's no presumption and the judge just decides the case on the facts. Is that – is that how it works? Yes. I mean, in this case, what we have here, and this is – and this actually works well, because regarding Petitioner's standard of substantial credible evidence, it's almost like a reverse summary judgment. Well, see, that's why I think it's probably got to be enough to get to – to get you past the presumption. We start out with this notion that somebody's not a citizen. You've got to produce some evidence that you are. Once you do, the judge decides the facts. Is that – Well, Your Honor, so let's – let's say that the Petitioner's presented 1 percent. 1 percent of the evidence is substantially – is substantially credible. The government has 99 percent of its evidence that's substantial and credible against Petitioner's claim. Under that substantial evidence standard, I guess Petitioner wins. He – they found 1 percent. But that doesn't make sense. It disregards the government's case. The government says, look, here, look, I have 99 percent of, you know, 9 percent – 99 percent of this evidence is substantial and credible, and it goes – and it shows that Petitioner's mother was not. Well, and that's – that's why I'm trying to – our cases seem to use these two terms and throw them around somewhat interchangeably. I'm trying to make some sense of them. And what I'm suggesting is – is that you – the Petitioner must produce substantial or credible evidence, or there's nothing for the judge to decide. Yes. Once the Petitioner does that, the judge decides by a preponderance of the evidence who wins. Yes. That – that – that's your – your understanding is correct. And that's why it's the standard. That's why it should be preponderance of the evidence. And it would be different if we didn't know that the Petitioner was foreign-born. Because at that point, the government would bear the initial burden, correct? Well, Your Honor, yes. In immigration proceedings, the government has a clear and convincing burden. So the fact that in this particular case, the parties agree the Petitioner is foreign-born, then the Petitioner starts with the burden. In immigration – in immigration – yes. Yes. That's – that's – He claimed – All – all I'm trying to do is make sure that I agree with my colleague as he has kind of put it to you and as you've answered. You're – you're correct, Your Honor. So if he were born – if he claimed he were born in Los Angeles, then the proceeding would be different. I mean, you'd have to go first and produce substantial credible evidence that he wasn't, and the judge's – judge would have to find by clear and convincing evidence that he wasn't. Well, Your Honor, to get there, this would – this wouldn't make it to the district court. It would – it would be at the immigration proceeding. Right. At the immigration proceedings level, we need to determine – we need to show clear and convincing evidence of alienage. And then after that, it's – the burden shifts to the Petitioner to show some evidence of citizenship. And this is all before getting to the final order of removal. And that is a major distinction here, because once you get to the 1252b-5 hearings, we are now talking about a final order of removal that's in place. And so the question is no longer is this person removable, is now it's just – it's about citizenship. And that's why it goes to the district court. That's why there is a higher standard. And that's why, you know, Congress has made this so important, to put in a specific provision on how these proceedings are going to go. But the matter in front of us, of course, is Petition for Review of the BIA order. I – Your Honor, yes – yes, it is. Right. And you've also – Given Judge – given Judge Stowe's factual findings, we now have to determine whether the order of removal is correct. Yes. And if I'd like to say that the proper standard for your review of the district court order is clear error, and as this Court has held to be clearly erroneous the decision must strike this Court not – more than just maybe or probably wrong, but it must strike us as wrong with the force of a five-week-old unrefrigerated dead fish. So you must really find this person removable. I think we know the clear error standard, counsel. Thank you. Ms. Sungaliu, you have some reserved time. Okay. So just three points in rebuttal. First is I was not able to finish the actual counting of the – of the testimony and the number of years, so I wanted to conclude that. So the inference from the evidence, and when I say evidence, in this case I'm talking about the testimony in the case-in-chief of just the siblings, not talking about the sister or the neighbor. We have testimony from the three siblings, one of whom says, you know, totaled five or six years of visits. We have other testimony indicating other times of visits in that time frame. And the inference from all of that evidence is that the mother visited three to six months a year between 1936 and 1961, and calculating that would be 75 months. Even if she didn't visit every year and visited 20 of those years, she'd still meet the three months times 20 years, 60 months requirement. And second of all, even under a clear error standard, this Court – I hate to stop you, but are you asserting – I thought you were asserting the five-year requirement. Are you also asserting the 60-month requirement? Oh, no. I am – In other words, it has to be five continuous years, doesn't it? Well, no. It's five years across the time frame. It can be gathered from different – You can be there an aggregate of five years, 20 years. An aggregate, correct, an aggregate. And even in a clear error standard, this Court in the past, in Murphy v. INS, has indicated that when a court has looked at the credibility of testimony compared to naturalization applications, if there is speculation from those naturalization applications, then this Court still can find that that does not weigh in favor of affirmance. And finally, the discussion of the burden shifting and how this actually works, ultimately, Supreme Court cases have said that in a deportation setting, ultimately, it is always the burden, the government's burden to ultimately prove by clear and convincing evidence that this person is deportable. And in the context of this is ultimately the burden of proof with regard to removability as not being a citizen. And so our burden was to rebut the presumption based on his birth in Mexico. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted. But we would like to ask counsel to stand by for just a moment. We're wondering, since you are in the immigration field, at least with respect to this case, is there anything you can tell us about the recent announcement by the President in terms of the change in immigration policy in the administration? And particularly, would it have any effect on any of the cases that are pending in our court? Counsel, for the government? Your Honor, yes. We are reviewing all of our cases to see how executive action comes into play. And with this case in particular, it would be perfected. Right. But with the other cases, we are. And so we are taking steps to kind of re-evaluate all of our cases to see, you know, whether or not the executive action has any effect on the possible discretion that he has, that President Obama has talked about. Can I take advantage of you for a second? And I won't hold you to this answer. Here's the dilemma we may have in some cases. We may be looking at cases and they may appear on their surface to fall within the President's executive order. Your Honor, I was going to speak to the punch. So are we to assume that you haven't beaten us to the punch, that you're holding your punches? Your Honor, I was going to speak to the punch. And that's why, as soon as it came down, we held several meetings and have been vigorously trying to make sure that, you know, we are proactively... So the cases presently in front of us that don't have any motions to the contrary, we should just go ahead and decide, since you're beating us to the punch? Yes, Your Honor, I believe that, you know, in some cases we should go forward, in some I have... But you will let us know which is which. I mean, the bottom line is, it seems to me you're either beating us to the punch or you aren't, because there are cases dead on in front of panels this week which might have effect by such an order. And we've heard nothing from the government as a result of this beating us to the punch. So are we to assume, go forward, as if it never happened, since no motions have been filed? Well, Your Honor, I believe that you should go forward and, on your first questions, try to leave as a suspect. See, here's our problem. And now we're going to pay you by the hour. Yeah. But our problem is that before the President came down with his executive action, we submitted some of these cases. So you're the only guy we have a shot at this week representing the government. Maybe the best we can ask you is to consult with your colleagues on the cases that are in front of the panel this week and see if we can assume from their silence that we should proceed with the case, that the government wants us to proceed with the cases. I will do that, Your Honor. Thank you. Counsel, do you have any observations? I can just confirm that in other cases where we have been afforded pro bono counsel and appropriations, the government had approached us already with regard to those. If there was a brief coming due or something like that, they would make a motion to raise it. So the government would have approached you. Obviously, this is not a case that comes within the amnesty order. But you're suggesting that the government would approach you on a case-by-case basis? Do you agree? All right. Well, then I assume, then, until we hear it of the contrary, we should decide cases on the merits. And if the government has identified a case that should be part of this program, they will let us know. But we shouldn't wait for any further. Now we have to thank you both for your pro bono efforts. Yes. Yes. Thank you. And I do. And we very much appreciate argument, very much. Thank you both. And thank you, counsel, for taking the pro bono. I appreciate it very much.
judges: O'scannlain, Smith, Hurwitz